Thank you. Good morning, may it please the court, I'm going to ask you on behalf of the petitioner, Mr. Quintana-Payan, I would like to reserve two minutes for rebuttal. Well, I'm trying to remind you, but keep an eye on the clock. I'm having trouble understanding you. Could you adjust your distance to the microphone or whatever is necessary? Yes, Your Honor, is this better? Yes, thanks. I will offer credit to Judge Glamour. Thank you. Your Honor, the matters before the court, we presented a few issues that we believe were errors committed by the immigration judge and also by the Board of Immigration Appeals. Regarding Mr. Quintana's application for cancellation of removal, while we understand his court's jurisdiction to address the question of whether the agency properly found U.S. citizen children suffering exceptional and extremely unusual hardship is limited, I understand the court cannot re-weigh the hardship factors, which included various factors presented before the immigration judge,  and the mother's medical issues. The court, however, cannot address the question of whether the agency correctly considered all relevant hardship factors under Figaro Act in Case State 543 at 3D487.7, quoting that this court must review whether the agency applied the correct legal standards to its discretionary determination, and also Figaro Act 974 at 3D909.9.12, recognizing a failure to engage in the required fair error review of the immigration judge's actual findings of legal error by the court warranted in there. The board held that the judge simply mentioning the severe health struggles of Mr. Quintana's wife, Lourdes, in the July 11, 2018, decision at FAR 67 meant that the issue did not need to be addressed further in its own decision and proceeded to ignore the health of Mr. Quintana's wife, which will directly impact his decision if she is able to provide her daughters upon the family's move to Mexico, or whether the children remain here in the absence of the respondent, and quoting that the fact that she would accompany her husband and the children in the event of the removal was a significant mitigating factor in the hardship that the children would face. We believe the judge did not treat Lourdes, Mr. Quintana's wife's helping ability or lack thereof to help the U.S. citizen children upon their move to Mexico as a relevant hardship factor, and the board, which explicitly refused to correct this error and instead held without support that the judge's mere mention of her condition had been properly considered. What do you make of this line in the IJA's decision that he considered the totality of circumstances, taking into account various things, and that he says also in connection with the medical issues that the respondent's wife presents? At this hearing, the respondent's wife was not permitted into the courtroom, and I believe that also was a factor considered by the judge. I believe the decision also states that because she wasn't present in the courtroom, the judge would not give much weight to her testimony, and that was also a factor that we believe. I'm not sure I understood what you just said. The wife wasn't allowed into the courtroom? Correct, Your Honor. It wasn't that she wasn't allowed. It's that she wasn't there and she appeared by telephone, and so the IJA said that the court gives limited weight to the telephonic testimony because the IJA couldn't verify that the person was actually who they said they were. And that is correct, Your Honor, but the reason she had to appear telephonic was because at the first hearing when the judge was informed that he had his wife available to testify, he indicated she would not be allowed into the facility. The respondent was at the Atenango Detention Center. He indicated she would not be allowed into the courtroom because she did not have status, and counsel informed the judge that that was in our understanding of the facility and the court's requirements. So that is why we were required to file a telephonic motion for the wife to appear telephonically, and that is the reason she appeared telephonically. Thank you. Could you address the particular social group of Mexican nationals returning from the United States? The immigration judge said that there wasn't any evidence about whether that group was viewed as distinct within Mexican society. Was that correct? Your Honor, it is our position that that is not correct. We believe we submitted sufficient and luminous articles and information regarding how, in fact, returnees are targeted. They know where the United States returns returnees. They know what facilities. They know the process. They know the procedure, and they specifically are targeted. And one of the reasons, the main reasons they are targeted is because they are returning from the United States. I thought that wasn't a hostility to the group, but just ordinary crime, shaking them down for money on the assumption that anybody who is in the U.S. for a while has more money. Well, our position would be that at some point maybe that's how it, you know, just criminals attempting to shake down. I believe as time has passed, unfortunately, this is no longer the issue. These are not minor criminals who target the returnees. I believe based on the articles, they are ordinary individuals, and even at times the police and government officials who it is known and has been documented also participate in targeting specifically the returnees. But is there any evidence that Mexican society in general perceives returnees to be a distinct class? I believe, Your Honor, the articles and information, and I believe some of the reports that were provided, do specifically speak about returnees and how they are targeted and how there's an article that we presented where, I apologize, I can't recall the exact name, I can take the time to look at it, but where specifically the article acknowledges, here in the United States, acknowledges that the returnees are targeted, and the Mexican government, the police, the officials, they know this is taking place, yet they don't take steps to prevent or protect the returnees. On the contrary, again, it's our position that there is evidence that they knowingly and willingly also participate in targeting the returnees, and by not doing anything to protect or assist, and knowingly participate in these actions against the returnees. So you want to reserve some time? Yes, Your Honor, thank you. Mr. Tennyson. May it please the Court, Robert Tennyson for the government. I'm going to respond to whether or not, the question about whether or not there's evidence in this record, how do you deal with social distinctions? Excuse me, counsel, I've got a preliminary question I'd like to pose to you. We recognize, obviously, what the difficult issues are that Petitioner has. However, there's something for the government here that I want to ask you. We've always gotten a lot of cases where somebody seems like he's a good citizen in every way, except he's not a citizen, and this looks like it falls within that category, pretty much. Good citizen landscaping work for 20 years, then he gets busted for drunk driving after he's built a life and a family in the U.S. and his occupation. Lately, there's been a change. The current administration has recognized that a lot of these good citizen in every way, except they're not a citizen cases, are not priorities, as they call them, for deportation. So we refer them to mediation, and the administration decides not to make them a priority, and everybody just goes back home. Is this case ripe for mediation in that way? Yes, Your Honor.  The Petitioner could look into prosecutorial discretion with ICE, absolutely. So if that's something that the Petitioner is interested in, we are interested in that as well. Thanks. That's what I wanted to find out. But moving on to the social distinction question. There's no evidence in this record of social distinction. The Petitioner essentially came in with three articles. There's the country conditions report for Mexico, which during both in her brief to the board, and I believe in her brief to this court, she refers to, and also the proposition that migrants are targeted. But what that country conditions report is discussing is migrants that are returning, that are actually coming into Mexico, either to seek protection or asylum status there, or coming through Mexico to seek asylum or protection status in some other country, the United States, or potentially Canada, that those individuals are targeted. It isn't a discussion as to whether or not returnees from the United States are being targeted. The second article. Who is the group again? I didn't really understand it. Who is the group being targeted? They're migrants that are actually coming into Mexico, not returnees from the United States. Guatemalans are coming through in Mexico to get to the U.S. Yes, or to seek protection in Mexico itself. The second article that has to do with high crime cities in Mexico, and highlights that they are extremely violent, but within various states there are cities that are extremely violent, others that aren't. And it has to do with gangs. There's no discussion of returnees there, again, as to whether or not they are distinct in any form or fashion. Likewise, there is another article with regard to cartels. Again, nothing having to do with distinctness. So the record as it was, the immigration judge, substantial evidence supported his determination. So that's all fine as far as the immigration judge's decision goes. Right. But then the board said something a little different. So I know you submitted a training letter on that. But take me through, why was it appropriate for the board to, on the face of its decision it seems like they viewed this as just a question of law, and they said the circuit has ruled on this, so we're done. They didn't look at any of that evidence or non-evidence. Right, right. I think that's a great question. So if you look at how the petitioner briefed this to the board in the first instance, she didn't seem to brief it about the facts, the underlying social distinction determination. Instead, he characterized it as Delgado Ortiz's bad law. You know, Cordelia Monroe came and undermined it. You have social distinctions like Rivas. And as a result, that social distinction determination should not be afforded any weight. And the board responded to that. And when it did so, in addition to referencing Perdomo and referencing, oh, goodness, it was the case with the really long social group, it did, the parentheticals do refer to, you know, the petitioner in those cases not providing any evidence, you know, that would distinguish it from Delgado Ortiz. So I think the board, even if the board didn't expressly say there was no clear error in the immigration judge's finding, it didn't have to here. One, because the petitioner didn't clearly raise that as an issue. And two, because implicit in the board's parentheticals and references to the subject of the other cases, it implied that those kinds of factual considerations, that the petitioner hadn't put forward those kinds of factual considerations, such that the immigration judge would depart from those prior cases. And there's a similar issue with respect to the treatment of anti-gang political opinion, where, I mean, the IJ's ruling seems to view it almost as a question of law that's foreclosed by legal precedent, and then the board seems to treat it as a factual question and say, you know, not enough evidence was produced. And so what do we make of that? Is there a mistake lurking there? I would say it's not the most articulate set of decisions in that regard. But under mean guide, we sort of look for a clear path. And one of the things, if you look at the record, page 64 and 65, the immigration judge does make a factual finding, essentially that the petitioner's testimony in the case was insufficient to support his burden with regard to everything from cancellation relief to withholding of removal. So you do have that underlying factual finding. So the board, you know, isn't making a factual finding in the abstract. But more importantly, the petitioner's argument on appeal to the board was about this argument that living a law-abiding life is a social good. That's not an argument that has appeared anywhere before in the record. So the petitioner's making it for the first time on appeal. And the board's response in its decision is to that argument. And it's essentially, you've offered no evidence to support this in the first place. You've not done anything to make this case. And that's all that it's doing. It's just recognizing that the petitioner hasn't substantiated, you know, never substantiated that case before the immigration judge. It's not an underlying, to the extent that this court doesn't find it to be an underlying factual finding. It is this other finding. It is this response to what the petitioner argued on appeal. Finally, I'm going to go to this other thing that seems to have come up. Can I ask you about the issue about the testimony of the wife who was not allowed at the Atalano facility? Is it, is opposing counsel correct in saying that the wife was told she was not allowed to come to the facility and then the IJ took the fact that she had to testify remotely to reduce her credibility? Do we have a due process issue lurking there? I'll first respond by saying it's not an issue that was exhausted before the board. That should have been exhausted before. It is a due process argument that should have been brought there. It's not in the opening brief, I believe. I think it's waived. But specifically to respond to the question, it looks like there was a, at the close of the petitioner's own hearing, it became apparent that the petitioner's spouse couldn't come in. And then during that period, the parties were supposed to work to have some way that the petitioner's spouse would be able to appear, would be able to testify. And then I guess as a result, the second hearing, it ended up that they could only do it telephonically. I'm not sure if that was because they couldn't hold the hearing, couldn't have a hearing, say, in a courtroom in Los Angeles itself and have her come in and testify physically there, or if those kinds of options weren't made available, if discussions with DHS weren't made or with the immigration court weren't made. But ultimately, you're right, she testified by telephone. She was unable to testify by telephone. I don't know. As a result, I can only look at the record. I don't know what transpired. It's a really odd comment from the IJ, because the IJ really think that he had, like, a phony spouse get on the phone instead of his real one. It's really quite odd. I will concede that that does seem a little odd. I don't know if it necessarily impacted the underlying case because there was documentary evidence of all of this information. I mean, one, the harm with regard to her vertigo and her health issues and how that would impact the three children in Mexico. I believe both the petitioner and the documentary evidence spoke to that. The immigration judge did consider it. And as a result, you know, I don't believe there would be any prejudice if this court did discuss it. But, again, I don't believe it was exhausted, and I don't believe it was brought forward in the opening brief, so it was probably thanked. If this court has no further questions, we'll move on. Thank you very much. Thank you, counsel. Ms. Garcia. Thank you. Your Honor, I think we also made it on the social group argument. And to address the court's question regarding mediation, we would not be opposed to mediation in this manner. I would agree with the court that the respondents, along with residents of the United States, his family, and the sole conviction would allow him to be considered for prosecutorial discretion. And we would not be opposed to mediation to look into that with the Department of Homeland Security. If there are no other questions, Your Honor, I will submit. Thank you very much. We thank both counsel for their helpful arguments this morning to determine the case to submit.
judges: KLEINFELD, MILLER, COLLINS